JOHN H. GEORGE, APPELLANT, *v.* CAROLINE E. GEORGE, AP-
PELLEE.

All secular work, business, or labor, on Sunday is prohibited, whether it be in a per-
son's ordinary calling or not ; unless it is excepted by the statute.

Any such business or labor done on that day, is to the disturbance of others within the
meaning of the statute, if done in their presence ; whether with or without their
consent.

The execution of a will on Sunday is not secular business or labor within the statute.

In the case of a devise upon condition subsequent, and the condition afterwards becomes
impossible, or is void for uncertainty, the estate of the donee is made absolute.

A gift by the husband to the wife of all his property, with a provision that she shall
convey by deed or will, the homestead farm and stock to her heir in the line of the
testator, vests the property in her immediately upon his death, and if there be no
such heir her estate is absolute.

If the will may take effect in any part it may properly be admitted to probate, although
some bequests be void for uncertainty.

THIS is an appeal from a decree of the judge of probate for the coun-
ty of Merrimack, declining to take jurisdiction of the probate of the
will of Paul R. George, upon the ground that the judge was interested
in the estate as husband of an heir or legatee, so as to give jurisdiction
to a judge of an adjoining county.

From the report of an auditor appointed to state the facts, it ap-
peared that the will in question was executed on Sunday while the tes-
tator was in ordinary health, and in anticipation of a voyage to Europe.
The rest of the facts sufficiently appear in the opinion of the court.

Upon an appeal from the decree of the judge of probate of the ad-
joining county of Hillsborough, approving the will, it was decided that
there was no such interest in the judge of probate of the county of Mer-
rimack as to give jurisdiction to the judge of an adjoining county, and
that consequently the whole subject of the probate of the will was be-
fore the court in the present case.

*J. Minot* and *W. L. Foster* for appellant.

*M. W. Tappan* and *Caleb Cushing* for appellee.

· BELLOWS, J.   By the report of the auditor it appears that this will
was executed at Hopkinton, where the testator then resided with his
wife, on Sunday, the 22d day of July, 1855, and was completed about
four o'clock in the afternoon ; that it was made in contemplation of a
voyage to Europe, the testator being in condition to attend personally
to his affairs ; that he remained at Hopkinton some days after the will
was executed, and then with his wife went to Lowell, Massachusetts,
where they remained until September following, when they sailed for
Europe ; and the auditor finds that there was no circumstance in the
condition of the testator's health, or the situation of his affairs, other
than the contemplated trip to Europe, and the necessary and prudent
preparation for his absence on such a journey, that rendered it necessary
to execute the will on that day.

The question then is, whether the making of a will under these circumstances comes within the prohibition of sec. 1, ch. 118, Rev. Stat. That section provides that "no person shall do any work, business, or labor, of his secular calling to the disturbance of others, works of necessity and mercy excepted, on the first day of the week, commonly called the Lord's day; nor shall any person use any play, game or recreation on that day or any part thereof."

The questions are, whether the making of the will was work, business or labor of the testator's secular calling, within the meaning of the act; and if so, whether under the circumstances disclosed it was to the disturbance of others, or was a work of necessity or mercy. In discussing these questions we propose to consider first, whether the act, assuming it to be secular labor, was of the testator's secular calling within the meaning of the statute; this question having been elaborately and ably discussed by the counsel on both sides.

As the act referred to is in many respects much like the English statute of 29 Car. 2, it may be useful, in the first place, to consider the construction given to that act by the English courts. By this statute of 29 Car. 2, c. 7, it is provided that "no tradesman, artificer, workman, laborer, or other person, shall do or exercise any worldly labor, business or work, of their ordinary callings, on the Lord's day, except works of necessity and charity, &c.; 3 Burns' Jus. 264.

The first reported case we find upon the point in question, is that of *Drury* v. *Defontaine,* 1 Taunt. 131, decided in 1808, and there it was held, that a sale of goods on the Lord's day made by a person not in the exercise of his ordinary calling was not within the act. The sale there was of a horse at private sale by one whose business was to sell horses at auction, that is, a horse auctioneer, and it was held that the sale was valid.

The doctrine of this case was approved in *Bloxsome* v. *Williams,* 3 B. & C. 232, decided in 1824. It was held, however, that the sale not being completed on Sunday it was not within the act, and also that if it was, as the vendee did not know that the seller was in the exercise of his ordinary calling in selling the horse, he, the vendee, might recover back the money paid for it, the horse not being according to the warranty. The doctrine of *Drury* v. *Defontaine,* is also recognized in *Fennell* v. *Ridler,* 5 B. & C. 406, decided in 1826; and in *The King* v. *Inhabitants of Whitnash,* 7 B. & C. 596, where it was held in 1827, that a contract between a farmer and laborer for a hiring for a year made on Sunday, was valid because not in the course of the farmer's ordinary employment.

In *Smith* v. *Sparrow,* 4 Bingh. 84, it was held that an action would not lie on a contract made on Sunday for the sale of nutmegs, and in the course of it, *Parker, J.,* took occasion to say that the construction in *Drury* v. *Defontaine* was too narrow, and that the terms "*any worldly labor*" could not be confined to a man's ordinary calling, but applies to any business he may carry on, whether in his ordinary calling or not. This point, however, was not raised by the case, and no opinion was expressed upon it by the other judges; and afterwards in *Scarfe*

v. *Morgan*, 4 M. & W. 270, the doctrine of *Drury* v. *Defontaine* was fully sustained, it being held that a farmer who happened to keep a stallion might recover for the use of it on Sunday, as not within his ordinary calling, although it appeared that the stallion was kept by the farmer for the use of mares.    The same doctrine is also recognized in *Wotton* v. *Gavin*, 16 Queen's Bench 48—62, holding that the enlisting of a recruit is not within the ordinary calling of a soldier, which is to attend drill, and fight the battles of his country.

From this statement of the English cases it is clear that labor, business, or work outside one's ordinary calling is not there deemed to be within the statute of 29 Car. 2, and it is also evident that the courts have not been disposed to regard any labor, business, or work, as within one's ordinary calling unless it clearly was so.

The N. H. Provincial Act of William 3d, passed July, 1700, Province Laws, p. 8, so far as regards this point, seems to be a copy of the statute of 29 Car. 2, providing that no tradesman, artificer or other person whatsoever, shall upon the land or water do or exercise any labor, business or work of their ordinary calling, &c.

By our statute of Dec. 24, 1799, for the better observation of the Lord's day, it is provided that no tradesman, artificer, or any other person whatsoever, shall do or exercise any labor, business or work of their secular callings, &c., thus substituting the word *secular* for the word *ordinary* in the provincial act, and in that of 29 Car. 2.    Upon this act the point in question came under consideration for the first time, it would seem, in *Frost* v. *Hull*, 4 N. H. 153.    In that case, which was decided in 1827, the English statute and its construction, as given in *Drury* v. *Defontaine* nineteen years before, were considered; and in the opinion of the court after citing that case, *Richardson, C. J.*, says : "It will be perceived that our present statute omits the word *ordinary* and substitutes the word *secular*, so that any work, labor, or business, relating to secular concerns, works of necessity and mercy excepted, seem to be within the prohibitions of the statute.    And it is believed that the statute has been so understood always by the community in general, and we cannot doubt that this was the intention of the legislature. We are inclined to think that if our forefathers had supposed that the word *ordinary* in the statute of 29 Car. 2 had the force and effect which it has been decided in England to have, they would not have copied it into our provincial act;" and accordingly it was held that a hogreeve could not on the Lord's day legally impound swine. that were unlawfully at large in the highway.    It is urged by the appellee's counsel that the question whether an act outside of the party's own secular calling was prohibited, was not necessarily raised, because the seizure of the swine might well be regarded as an act within the ordinary calling of a hogreeve.    But however this may be, it is clear, we think, that the court chose to waive that question, and put their decision upon the ground that our statute, unlike the statute of 29 Car. 2, as construed by the English courts, prohibited all secular labor, business and work, on the Lord's day, works of necessity and mercy excepted—whether

such labor, business, or work, was in the exercise of one's ordinary calling or otherwise.

There, can be, we think, no doubt that such was the opinion entertained and expressed by the court; and inasmuch as it was competent for the court to decide the case upon that ground, instead of determining whether the act in question was within the ordinary calling of the party or not, it cannot properly be said that the opinion was extra-judicial. Indeed, in view of the decisions of the English courts, that the sale of a horse at private sale by a horse-auctioneer—a hiring for a year of a servant by a farmer—a contract by a farmer for the use of a stallion kept by him for the use of mares, were not within the ordinary callings of the parties, it might be difficult to determine whether the seizure of swine by a hogreeve was or was not within his ordinary calling.

The attention of the court was distinctly turned to the construction of the English act by their courts, and it is unquestionable, we think, that the court intended to give to our law a different construction based largely if not mainly upon the substitution of the term *secular* in the New Hampshire act, for the term *ordinary* in the English act, and we think this change was one of much significance. In the English act *worldly* labor, &c., in one's *ordinary* calling is prohibited; but the term *ordinary* is used not to denote *worldly* labor, for that is otherwise expressed in the use of the term *worldly*, but to denote the labor that is done in a person's usual or accustomed employment or calling. The term *secular* substituted in the New Hampshire statute for the term *ordinary*, on the contrary, has no such limitation, but applies to all worldly labor whether of a person's calling or not; and there is nothing in the act to restrict it but the term *his calling*. In *Frost* v. *Hull* it was supposed that this change was significant of an intention to make the prohibition general, notwithstanding the retention of the term *"his calling,"* and we are not prepared to say that this is not a correct view of the act. The change of a term which is limited, for one that has no limitation, is certainly significant, and affords some indication of a purpose to remove the distinction between labor done within one's ordinary calling, and labor outside of it.

In *Shaw* v. *Dodge*, 5 N. H. 462, it was decided that the service of civil process on the Lord's day is illegal under the act of 1799, before quoted; and it was so held without determining whether the act was within the person's ordinary calling or not, the court holding that the object of the legislature undoubtedly was to prevent unnecessary labor and recreation during one seventh of the time. In *Clough* v. *Davis*, 9 N. H. 500, *Woods, J.*, referring to the difference in the phraseology of the English and the New Hampshire statutes, says, the prevailing opinion seems to be that in this State all secular contracts made on the Sabbath are void; for which he cites the above cases of *Frost* v. *Hull*, and *Shaw* v. *Dodge*.

In *Allen* v. *Deming*, 14 N. H. 133, it was decided that a note given for shingles on Sunday was business of one's secular calling, and therefore void, and this was without any inquiry whether the transaction was or was not within the maker's ordinary calling.

In *Smith* v. *Bean*, 15 N. H. 577, it is assumed that a sale of oxen on Sunday would be void, so that no action for the price could be maintained, and here there was no inquiry as to the act being within the parties' ordinary calling.   Of a similar character is *Varney* v. *French*, 19 N. H. 233.

By the Revised Statutes, ch. 118, sec. 1, a change is made in the law of 1799, and instead of providing that no tradesman, artificer, or any other person whatsoever, shall do any labor, &c., as in the old law, the Revised Statutes enact that "no person shall do any work, business, or labor of his secular calling to the disturbance of others, works of necessity and mercy excepted, on the first day of the week, commonly called the Lord's day."

In *Corey* v. *Bath*, 35 N. H. 531, it is held that travelling on Sunday to make a social visit is not within the statute forbidding the use of any game, play, or recreation on that day.

*Perley*, *C. J.*, in giving the opinion of the court, after quoting this section of the Revised Statutes, says : "A more extended operation has been given to that branch of our statute which prohibits work, business, or labor of the secular calling on Sunday, than the English statute on that subject has received ;" citing *Frost* v. *Hull*, and *Allen* v. *Deming*.

In *Smith* v. *Foster*, 41 N. H. 215, decided in 1860, it was held that a contract for the sale of a note on Saturday, but perfected by a delivery on Sunday, and the payment of the price, must be regarded as made on Sunday, and was business of one's secular calling, and void, so that neither could maintain an action upon it against the other.   In giving the opinion of the court, *Sargent*, *J.*, says it is not business of one's ordinary calling or common occupation that is prohibited by our statute, as was the case by the English Sunday act of 29 Charles 2, ch. 7, sec. 1, but of his secular calling.   This distinction between *ordinary* calling and *secular* calling will readily be perceived.   It will be observed also that in this case, as in all other cases in the New Hampshire courts, no inquiry is made to determine whether the act or contract in question was within the ordinary calling of the party doing or making it ; but the only inquiry seems to have been whether the act was secular in its nature, without regard to the calling of the person doing it.

The case of *Frost* v. *Hull* was in 1827, *Shaw* v. *Dodge* in 1831, and *Allen* v. *Deming* in 1843.   The English cases were *Drury* v. *Defontaine* in 1808, *Bloxsome* v. *Williams* in 1824, *Fennell* v. *Ridler* in 1826, and *The King* v. *Whitnash* in 1827 ; most of them about the time of *Frost* v. *Hull*.   Under these circumstances we can entertain no doubt that the doctrines of the English courts must have been in full view when the New Hampshire decisions were made.

It will be perceived, also, that the doctrines of the New Hampshire courts are in general correspondence with those of other American courts on the point in question.   See 2 Parsons on Contracts, 3 ed. 262, c., note ; Chitty on Con., 9 Am. Ed. *374, and notes.

It has been urged that our statute of 1799 is in substance the same as that of the English statute of 29 Car. 2, and that in adopting it we also adopt the construction given to it by the English courts.   The an-

swer to that is two-fold, first, that the construction so given was not until 1808, and therefore subsequent to the passage of our statute; and in the second place, that substantial changes were made upon the very point in question.

It may be proper also to observe that by the Revised Statutes *all* persons are clearly prohibited from doing secular labor, &c., while by the statutes of 29 Car. 2, no tradesman, artificer, workman, laborer or other person is allowed to do any worldly labor, &c., of his ordinary calling, &c.

Under this English statute it is held that drivers of stage coaches are not included because they neither are named, nor do they come within the term *other person* as they are not *ejusdem generis* with the classes that are named. *Sandiman* v. *Breach*, 7 B. & C. 96. Neither is a farmer included for the same reason. *Regina* v. *Cleworth*, 116 Eng. Com. Law Rep. 927. In that case it is said that this law was directed more against the lower than the higher classes, and although it might occasion some scandal to hold that the farm laborer would be liable for doing work on Sunday, and that his employer, the farmer, would not be, though standing by and directing it to be done, yet the legislature could alone provide a remedy.

Such views and conclusions as these, so utterly inconsistent with the spirit of our own institutions, would certainly not commend the law or its construction to our ancestors'; and it is quite clear that the law of 1799, which, like the English statute, provided that no tradesman, artificer, or any other person whatsoever, should do any labor, &c., was never understood by our courts to be confined, in its application, to persons belonging to classes like those enumerated. On the contrary, the whole course of our decisions shows, that the law was applied to all classes and descriptions of persons alike; and in this respect according with the spirit of the construction which included all secular labor, whether within one's ordinary calling or not. In both these respects the construction given by our courts is, we think, in harmony with the policy that dictated the law, and with the general course of our legislation.

The same policy is also shown in the English statute, the preamble to which sets out that "every person whatsoever shall on the Lord's day apply themselves to the observation of the same by exercising themselves in the duties of piety and true religion, publicly and privately." See *Drury* v. *Defontaine*, and so is our provincial act of 1700, before cited; and this, we think, might have furnished a strong argument in favor of a more enlarged application of the English law, as suggested by *Parker*, J., in *Smith* v. *Sparrow*, 4 Bingh. 84, it being very apparent that it was the policy of that law to promote the observance of the Lord's day by all persons without distinction of class or occupation.

This construction given by the English courts was probably much influenced by the ancient rule which was supposed to require a strict interpretation of penal statutes. In this State before the decisions of our courts upon the statute in question, this rule had been materially modified. *Fairbanks* v. *Antrim*, 2 N. H. 105; *Pike* v. *Jenkins*, 12 N. H. 255.

In the practical working of the English law construed as it has been, the difficulties to be encountered must be most embarrassing, as is apparent from the case of *Regina* v. *Cleworth*, 116 Eng. Com. Law. Rep. 927. It must indeed often happen that of two or more persons engaged in doing the same act one would be guilty of a penal offence, and the other not, because he did not happen to belong to a class of persons who were required to keep the Lord's day. In England, now, where the division of labor is much more marked than in this country, it must often be difficult to determine the *status* of an offender. In this country where the boundaries between different callings are not very distinct, and the same individual is often not only a farmer, but a laborer, gardener, lumberman, drover, and soldier, and does his own carpenter work, shoemaking, and to a great extent his tool-making, it would, in many cases, be difficult to determine what was his ordinary calling; and this might well be used as an argument against the construction contended for by the appellee.

Upon these views we are brought to the conclusion that it must be considered as settled that any secular labor, &c., is within the statute, whether within one's ordinary calling or not.

The next question we propose to consider, is whether the execution of this will, assuming the act to be secular, was to the disturbance of others. This raises the general question as to the true construction of this clause in the act "to the disturbance of others." It is quite apparent that by the introduction of this clause into the Revised Statutes, a substantial change of the former law was contemplated, and to ascertain the extent and character of that change, it becomes material to understand accurately the objects and policy of the previous legislation on this subject.

Our provincial statute of 1700, as has been seen, was a substantial copy of the statute of 29 Car. 2, and our statute of 1799, which continued in force until the Revised Statutes, made but a little change except in substituting the word *secular* for the word *ordinary*.

The policy of the English act and of our Provincial act of 1700, is disclosed in the commencement of those acts providing that all and every person and persons whatsoever shall on that day carefully apply themselves to the duties of piety and religion, publicly and privately; and it is held in *Drury* v. *Defontaine*, that it was the object of the legislature to enforce the practice of religious duties as expressed in the preamble to the act.

In *Fennell* v. *Ridler*, 5 B. & C. 406, it is laid down that "the spirit of the act is to advance the interests of religion, to turn a man's thoughts from his worldly concerns, and to direct them to the duties of piety and religion; and the act cannot be construed according to its spirit unless it is so construed as to check the career of worldly traffic." The opinion was delivered by *Bailey, J.*, and although in *Bloxsome* v. *Williams*, he had expressed some doubts, he says he is satisfied upon further consideration that every species of labor, business, or work, whether *public* or *private*, in the ordinary calling of a tradesman, artificer, workman, laborer or other person, is within the prohibition of the

statute, and that there is nothing in this act to show that it was passed exclusively to promote *public* decency, and not for regulating private conduct.

The object of the English statute, then, was to promote the due observance of the Lord's day, by putting a stop to unnecessary worldly labor and business, at least among the persons and classes enumerated, and others like them—whether such labor and business was open and public or in private—and this not only for the sake of public decency* and order, but to withdraw a man's own thoughts from secular concerns, and turn them to the duties of religion.

In respect to the Provincial act of 1700, and the law of 1799, we can entertain no doubt that their purpose and object were substantially the same, although the act of 1799 had a larger scope and was more general in its application, reaching all persons and all secular occupations alike; and we think it too clear to admit of question that with the view of enforcing the observance of religious duties on the Sabbath, unnecessary secular business and labor were forbidden equally whether public or private.

The changes introduced by the Revised Statutes was designed to withdraw all legislative control over the acts and conduct of the individual citizen, so far as they did not interfere with the public observance of the Lord's day—wisely holding that in respect to acts of a private nature not calculated to disturb others in the exercise of the appropriate duties of the day, the individual conscience alone should decide.   At the same time we perceive no intention to diminish the restraints upon those unnecessary worldly acts which interfere with the public observance of the Lord's day; and therefore such acts when done openly or publicly in the presence of others are prohibited, because they are calculated to turn the attention of those who are present from their appropriate religious duties to matters of mere worldly concern, and thus to *disturb* them in the sense in which the term is used in the statute.   The policy of the act is still to encourage the due observance of the Sabbath, as a day of rest from worldly labors and traffic, and of devotion to religious duties; and although it is left to the conscience of each citizen to decide whether he shall himself in private perform any secular labor, he must take care to do no such labor in a manner to turn the attention of others from their appropriate duties and fix it upon worldly business or traffic. The purpose is to give every citizen an opportunity to discharge the religious duties incumbent upon him on that day, without being disturbed, or having his attention withdrawn, by the career of worldly traffic or labor; and it is wholly immaterial whether it be so withdrawn with his own consent or not, inasmuch as such acts are equally subversive of that public order and decency which the law designed to promote, whether assented to or not by the persons present.

The question was fully considered in the case of *Varney* v. *French*, 19 N. H. 233, and it was there determined that any business was to the disturbance of others which withdrew their attention from the appropriate duties of the Lord's day, whether such other persons were or were not willing that such business should be done.   In this case the business

was the giving of a promissory note on Sunday for the price of a horse, and it was held that it was void.   These views were afterwards recognized in *Smith* v. *Foster*, 41 N. H. 215, and with the doctrine of those cases after careful consideration we are satisfied; and see *State Capital Bank* v. *Thompson*, 42 N. H. 369.

It has been urged that the question whether the act under consideration was to the disturbance of others must always be one of fact, and should be submitted to the jury; but if business has been transacted of a secular character, and not within the exceptions, and in which two or more persons have taken a part, and there be no controversy as to those facts, then upon the interpretation which has been given to these terms, the disturbance is a conclusion of law; and so is the case of *Varney* v. *French*.   Against this view the case of *Dalton* v. *Weare*, 17 N. H. 34, is cited.   That case was decided in July, 1845, and it was there held that travelling upon Sunday was not unlawful if not to the disturbance of others, and it was also held that there was no evidence of such disturbance, although the traveller started with a heavy team from his hotel on Sunday, taking with him two men and an extra horse and sled to enable him to get through a snow drift which he expected to encounter, and which occupied them all for several hours.   In deciding that here was no evidence of disturbance to others, it is clear that the court did not take the view which we have adopted; but it will be perceived that the point was not discussed in the opinion reported; see *Varney* v. *French*, which was about three years later.   The point appears to have been fully considered by the court, consisting of Gilchrist and Woods, who delivered the opinion in the former case, and Wilcox, Eastman and Bell, and although the case of *Dalton* v. *Weare* was not cited, it can hardly be supposed to have escaped the attention of Gilchrist and Woods who were on the bench at the time.

The case of *Clough* v. *Shepherd*, 31 N. H. 490, is also cited by the counsel who sustains the will, but that was a question of pleading merely, it being held that the plea must bring the case within the statute, by alleging that the act was to the disturbance of others.   Whether the facts set out in the plea would be proof that the act was to the disturbance of others, the court gives no opinion.

Upon these views we are of the opinion that the execution of the will in the presence of others, must be regarded as being to the disturbance of others within the meaning of the statute, and upon the principle laid down in *Varney* v. *French*, provided it be held to be a secular act.

The remaining questions are whether the execution of a will on Sunday is work, business, or labor, of a secular calling, and if so, whether in this case it was a work of necessity within the statute.   And, first, was the act secular in its character within the meaning of the statute?

The question as it stands before the court, is, whether the execution of a will simply, and nothing more, is a secular act; but we are inclined to think that, as respects this question, no distinction can be made between the mere execution, and the preparation and drawing of the will, nor in fact is any such distinction urged by the counsel.   In the execution of a will more is implied than the mere affixing of the

signatures of the testator and witnesses. These witnesses are by the law placed around the testator that no fraud may be practiced upon him, and also to judge of his capacity ; and therefore they are competent to give opinions as witnesses as to his sanity when the will was executed. The attesting of the will, then, implies a knowledge in the witnesses of the facts necessary to a legal publication of the will.

In the course of its execution, ordinarily, the will would be read, or at least it would be highly proper that it should be, and between the acts necessary and proper to be done in the execution of the will, and the preparation and drawing of the same, we perceive no substantial distinction so far as the question immediately under consideration is concerned. Both are of the same nature. If the drawing of the will is business of a secular nature, so is the execution of it. It is true that upon the question of necessity, which might turn upon the moral fitness or propriety of the act, some respect might possibly be had to the time required to be occupied in doing it, whether in the mere execution or in the drawing of the will as well ; but this would bear on the question of fact alone, and could not affect the character of the act ; that is, whether it was secular or not.

The question before us, then, may properly be considered to be whether the making and execution of a will is a secular act. In deciding this question we are not much assisted by adjudged cases, unless it be the case of *Bennett* v. *Brooks*, 10 Allen 118. That case decided in 1864, is to the effect that the execution of a will is not work, labor, or business within the meaning of the Massachusetts Sunday law. That law provides that "whoever keeps open his shop, workhouse or warehouse, or does any manner of labor, business, or work, except works of necessity or charity, on the Lord's day, shall be punished," &c., and it is held in *Bennett* v. *Brooks*, that "it is a mistake to suppose that the legislature intended to forbid or restrain every act of a temporal nature not coming within the exception ;" but that "the purpose of the statute is only to prevent the carrying on of the usual and ordinary callings and occupations of men by which they gain a livelihood, or acquire property, and the doing of such acts as are connected with worldly affairs and the common transactions of business."

This conclusion is based upon the ground that the general words of the statute prohibiting the doing of any manner of labor, business, or work, are qualified by the terms that immediately precede them in the same sentence ; that is, the words, "shop, workhouse, or warehouse ;" and that the general words which by themselves include *all* secular acts, are to be so restrained as to signify only such acts as are of the same nature, *ejusdem generis*, with those with which they are associated : "That by designating the keeping open of a 'shop, warehouse, or workhouse,' as an employment which would subject a person to the penalty imposed by the statute, the inference is a fair and reasonable one that the legislature intended to embrace by the more comprehensive terms which follow, all other secular callings and occupations, whatever might be their nature, which were pursued in like manner and for similar purposes and objects." So interpreted, it was held that the law prohibited only such an

employment or calling carried on for purposes of gain or profit, and all transactions and dealings connected therewith, or such as are usually incidental thereto ; and therefore the court decides that the making of a will, although, strictly speaking, it may properly be considered as a secular transaction, is not within the statute ; in other words, that the making of a will is not of the same general nature as acts done in the occupations or employments specially indicated in the statute.    This canon of construction under which the general words in this statute have been so limited, is everywhere recognized, and although it is often difficult to determine whether it should be applied in a given case, we are not disposed to question its application here.

It will be perceived, however, that our present statute contains no enumeration of occupations or employments which are forbidden, but prohibits all secular work, business, or labor, works of necessity and charity excepted.    Even the statute of 1799, which did enumerate occupations, providing that no tradesman, artificer, or any other person shall do or exercise any labor, &c., received, as we have seen, a construction that embraced all secular labor whether in the occupations enumerated or not.

Under these circumstances the case of *Bennett* v. *Brooks* does not, as an authority, bear directly upon the question before us, for the decision there turns upon expressions in the Massachusetts statute which are not found in ours.    In short, the Massachusetts statute is held not to prohibit all secular acts but only those of a nature like such as are enumerated ; and that making a will does not fall within the prohibited classes.    On the other hand, our statute prohibits all secular labor, business and work, except works of necessity and mercy.    It is clear, therefore, that *Bennett* v. *Brooks* does not determine the question before us, although it may bear incidentally upon some of the points involved.    In that case as illustrating the position that the legislature did not intend to prohibit all secular labor or business, the learned Chief Justice who gave the opinion, mentions the case of marriage as one which would undoubtedly be valid though concluded before a civil magistrate on the Lord's day.    Such a marriage, we have no doubt, would be valid under our law, although it must be regarded as a civil contract. The reason given by the learned judge is, that such an act does not come within the category of transactions which are connected with or appertain to ordinary worldly business, and he holds that the same reason applies with still greater force to the execution of a will on the Sabbath.

In respect to the marriage, however, its validity may be put upon the ground that the contract has been executed, and the *status* of the parties changed by it, and therefore, as in other cases where certain acts are forbidden by statute, but not expressly declared void, the law will not interfere, but leave the parties where it finds them.    As in the case of money won at play where the parties are in *pari delicto ;* and there the law will not lend its aid to recover it back.    *Welsh* v. *Cutler*, 44 N. H. .561.    So in the case of a wager, if the money be actually paid over it cannot be recovered back, but if not paid an action will not lie to enforce it.    *Perkins* v. *Eaton*, 3 N. H. 132.    The same general

views are fully recognized in *White* v. *Hunter*, 23 N. H. 129, and cases cited.

In *Smith* v. *Bean*, 15 N. H. 577, it was held that a sale of a pair of oxen on Sunday was so far void that no action could be maintained by the vendor for the price, or by the vendee upon a warranty of title or soundness, but as the sale was perfected by the delivery of the oxen the law would not aid the seller to recover possession of them. Upon the same ground a conveyance of land on Sunday actually perfected would be good to pass the title ; and so it is expressly held in *Sherman* v. *Sherman*, 3 Casey's (Penn.) 74. Indeed the case of *White* v. *Hunter*, before cited, was a conveyance of land for an immoral purpose, and yet it was held that the title passed.

Upon these grounds the marriage might well be regarded as valid because it is executed, and the status of the parties changed, even if the solemnization on Sunday was prohibited.

Another question might be raised, however, and that is, whether the parties would be liable to a penalty. The objection to that would be the very common practice of solemnizing marriages on Sunday, which has for a long time and extensively prevailed, indicating a general consent and acquiescence in the fitness and propriety of such acts on that day. .The reason for this practice is to be found in the idea that the act was not wholly secular in its character, but rather of a solemn nature, ordained of God, and properly to be celebrated with religious rites and ceremonies. Indeed, this is indicated by the very terms of our law by which ministers of the gospel and justices of the peace, are "empowered to *solemnize* marriages."

In the Roman Catholic church, marriage for a long time has been regarded as a sacrament and indissoluble, upon the precept, "what God hath joined together let no man put asunder ;" although in some Catholic countries, as in France after the Revolution, provision was made by law for divorces, which remained until the restoration. In many, if not most, Protestant countries, marriage has been regarded mainly a civil institution, and subject to legislative authority ; Story on Con. of Laws, secs. 209, 210 ; but they nevertheless esteem it as of divine origin ; and in most civilized countries it has been invested with the sanctions of religion. Bishop on Marriages and Divorces, sec. 31 ; Story's Con. of Laws, sec. 108.

At common law as now held in England, a new civil contract entered into *per verba de presenti* without any ecclesiastical or legal sanction, was not valid ; *The Queen* v. *Millis*, 10 Clark & Findley 34, in the House of Lords ; *Catherwood* v. *Caston*, 13 M. & W. 261, where a marriage was celebrated according to the rites of the Church of England, but not in presence of a priest in holy orders ; and it was held to be invalid at common law. This decision was in 1844. In the United States it has been held otherwise at common law, and especially in our own State, in *Londonderry* v. *Chester*, 2 N. H. 268. On the same point in 1843, the Supreme Court of the United States in *Jewell* v. *Jewell*, 1 How. 219, was equally divided and gave no opinion.

By the English Statute of 26 Geo. 2, it was required that marriages

should be celebrated in churches or public chapels, where banns were usually published, or else they were void, and a marriage was so declared because celebrated in a church erected since the passage of that act. *The King* v. *Northfield*, Doug. 659 ; 1 Blk. Com. 439.

In this country and in our own State, the practice of celebrating marriages in places of public worship is very common ; and religious services on the occasion are very generally regarded as appropriate, if not essential. The law of the State undoubtedly regards it as a civil contract, and yet this is by no means incompatible with the idea that it is also a religious institution ; and in this light it has generally been viewed in all civilized and Christian communities. Story's Con. of Laws, sec. 108 ; Bishop on Marriages and Divorces, sec. 31. The law, however, deals with it only as a civil contract, though peculiar in its character, and lying at the very foundation of civil society, leaving its sacredness to be protected by the religious sentiment of the community. Its vast importance as the basis on which the fabric of human society rests, has very naturally begotten the idea that it has a divine origin, and given to the contract a religious aspect and a solemnity that no other possesses.

There is, therefore, abundant reason for the general sentiment which regards the solemnization of marriages as in entire harmony with the religious observance of the Lord's day. That there is, and for a long time has been, such a sentiment, we think there can be no question, and therefore such an act may well be regarded as morally fit and appropriate to the duties of that day.

We have examined this point with the more care because we think the views derived from the examination have an important bearing upon the inquiry whether the making of a will has such characteristics as to exclude it from the operation of our Sunday law.

The conclusion we have reached in respect to marriages will apply with equal if not greater force to funerals, which in all civilized communities are occasions of great solemnity, and attended with imposing religious exercises ; and in our own country are universally esteemed to be in harmony with the duties of the Christian Sabbath. Is the making of a will also to be classed in this respect with marriages and funerals ? Is it to be regarded as secular work, business, or labor, in the sense of the statute under consideration ?

In determining this question the only legitimate inquiry is, in what sense was the term *secular* used in that statute. Was it used in a sense to include the making of a will, or not ? In prosecuting that inquiry it is obviously important to know, if we may, how such an act was generally regarded in this State at the time of the passage of the act. The term *secular* was first used in the law of 1799, when it was substituted for the word *ordinary*, in the Provincial act of 1700, which was copied mainly from the act of 29 Car. 2. The term was retained in the Revised Statutes now in force, and there is no reason to suppose that it was used in any other sense than in the former law, especially as it had already in the former law to some extent received a judicial construction. In what sense, then, was this term used in our statutes ?

In regard to the importance of a strict observance of the Lord's day,

different views are entertained at the present time founded mainly upon different opinions as to the sacredness of the day, and the religious obligation to observe it; but it is to be remembered that it is the duty of the court merely to give a true interpretation to the language of a human statute, so that it shall speak according to the intention of its framers, and not according to the fluctuating opinions of the schools, leaving it to the legislature alone to make such changes in the law from time to time, as the altered condition of things may demand. We shall, therefore, be careful not to press the language of this statute beyond the sense in which it was used by the legislature, either to enforce a stricter observance of the Sabbath, or with any view to conform to a supposed change in public sentiment in favor of relaxing the stringency of former obligations, but shall endeavor simply to ascertain the sense in which the terms under consideration were used by the legislature. And with this view it may be proper to examine a little more closely the character of the act now drawn in question, namely, the execution of a will. As before remarked, this must necessarily include more than the mere affixing of the signatures of the testator and the subscribing witnesses. Ordinarily the will should be read to the testator, or by him, at the time of its execution, unless previously made acquainted with its contents; and generally an explanation of its provisions would be necessary. Then the witnesses who are by the law placed around the testator to protect him from imposition and undue influence, are to consider his mental condition, and form an opinion as to his capacity to make a will, and that opinion they are permitted to give as witnesses at the probate of the will, although they may not be experts.

Between these acts and the drawing of the will, attended though it may be with a large amount of the most skilled professional labor, we can perceive no substantial distinction, and we are therefore required to consider the question as if it included the drawing, as well as the execution of the will.

The inquiry, then, is, whether the making of a will was included in the term *secular* labor cited in the statutes of 1799 and 1842, or whether in its character it was rather to be associated with marriages, funerals and other acts esteemed to be not inconsistent with the sacredness of the Lord's day. As bearing upon this inquiry, it is proper to consider the form of these instruments in general use at these periods; and there seems to be no controversy that they usually commenced with an invocation, and contained other expressions indicating that the act about to be performed was done under a solemn sense of religious obligation and duty. Such is the character of the forms given by the late Chief Justice Richardson in his Justice of the Peace, and so far as the examination of the counsel, on both sides, of a large proportion of all the wills brought to probate in this State, has disclosed the forms of those wills, they seem to be of the character here indicated; and they fully justify the conclusion that these instruments were not regarded as ordinary secular acts. It is very true, as suggested by the appellant's counsel, that in many cases these expressions may have been a mere form, but we think it can hardly be supposed that those forms would long be retained

after the religious sentiments which they express had generally ceased to exist.

As bearing upon the question, whether wills were regarded as secular acts, at or about the periods when the term *secular* was introduced into our statutes, a large number of wills have been examined, commencing with the organization of our separate Provincial Government in 1679. From the examination by the counsel, it appears that from 1679 to the year 1700, when a law was passed here substantially like that of 29 Car. 2, the whole number of wills proved was thirty-eight, of which two were dated on Sunday. From 1700 to 1771, when the province was divided into counties, previous to which all the records were in Rockingham county, the whole number of wills was 1912, of which 36 were dated on Sunday. From 1771 to 1823, until which time what is now Merrimack county was a part of Rockingham county, the whole number of wills in the latter county was 1621, and of these 35 were dated on Sunday. From 1842, when the Revised Statutes were passed, to 1848 inclusive, the whole number of wills found recorded in Rockingham county was 485, and of these eight were dated on Sunday. In Merrimack county from 1823 to October, 1866, the whole number is 2125, of which 25 are dated on Sunday. In Belknap county from its organization, the whole number of wills was 860, of which seven were dated on Sunday. In Hillsborough county since its organization, the whole number of wills is 3235, of which were dated on Sunday, forty-five. The result is that of 10,276 wills examined, about 156 were dated on Sunday, although as to the precise number the parties do not quite agree, the counsel for the heirs at law contending that the number was not more than 152, and the other side holding it to be about 160.

Of these Sunday wills a little more than one hundred state that the testator was "sick and weak," or use some equivalent expression; or else the probate was so soon after the execution as to afford a fair inference that the testator was then sick. A few, five or six in number, state that the testator was in good health, but the rest are silent as to his bodily condition; and in several cases where the will states that he was sick and weak, the probate was not had for several years after the execution of the will.

This examination shows that wills were not made on Sunday as freely as upon other days—the number of Sunday wills being but one in about 66 1-2, and of those where the testators were not apparently sick, not more than one in two hundred—and yet it is apparent that even if the making of wills had been regarded as not within the prohibitions of the statute, a less number would naturally be made on Sunday than on other days, for the reason that places of business are usually closed on that day.

In one point of view the facts elicited by this examination have some significance. It appears that a very considerable number of wills were made on Sunday, one in sixty-six; and yet no case has been found in this State where such wills have been questioned. Had they been regarded as coming within the prohibitions of the statute as secular acts, and only valid when executed under a sense of approaching death, there

is a high degree of probability that some of them would have been the subject of judicial inquiry; and especially where the testator was alleged to be in good health; and yet they have all been proved, and for aught that appears, established as valid wills.

It is proper also to observe, that no case is found in England or in the United States, which holds such a will to be invalid; and this, we think, is entitled to some weight, although that weight is doubtless diminished by the fact that the English statute of 29 Car. 2, which seems to be the root of most of this legislation in this country, has received in New Hampshire some modifications which it has not elsewhere received. The different modifications in various States are shown in Parsons on Con. 2 vol. 262, c., note. In this aspect of the case, with one hundred and fifty or more Sunday wills proved and allowed out of the number examined, we think the absence of any decision to the contrary has considerable significance upon the question whether the making of wills on Sunday was understood to be prohibited.

In *Bennett* v. *Brooks*, before cited, Chief Justice Bigelow says, although strictly speaking, the making of a will may properly be considered as a secular "transaction having relation solely to worldly affairs, it is, nevertheless, a solemn act which no one ought to perform lightly or unadvisedly, but which is rather to be taken in hand discreetly, soberly, reverently, and in the fear of God." Again he says: "If any act not of a strictly sacred or religious character can be appropriately performed on the Sabbath, it would seem that the execution of a will is one which may properly be held to be not inconsistent with a due observance of the day." Although the decision in *Bennett* v. *Brooks* is not authority here for the reasons before given, yet this statement of the light in which the making of wills is regarded in Massachusetts, coming as it does from their highest judicial tribunal, is entitled to much consideration.

Of a similar character is the fact that in England wills were regarded as instruments of such a serious and solemn nature as to come within the original jurisdiction of the spiritual or ecclesiastical courts. It may be observed also, that in the order for the visitation of the sick contained in the Book of Common Prayer of the Episcopal church, the priest is directed not only to examine the sick person upon the subject of repentance of his sins, but to admonish him to make his will, if he have not already done it.

We have been referred by the counsel for the heirs to the case of *Wiedman* v. *Marsh*, decided in Pennsylvania, and reported in 2 Hall's Am. Law Journal, 408. This case decides that a will made on Sunday under a sense of approaching dissolution is valid, and that in the absence of any evidence to the contrary, it will be presumed that such circumstances of necessity existed as to justify the act. At the same time the court says that these views "render it unnecessary to decide whether a will made on Sunday without such necessity is valid." This case therefore cannot be regarded as an authority for the heir in the cause before us.

Upon these views we are brought to the conclusion that at the time

of the passage of the laws of 1799 and 1842, the making of a will was not regarded as a *secular* act within the meaning of the term as used in those statutes, but was rather of a peculiar and exceptional nature, and, like marriages and funerals, was regarded, on account of its solemnity and its association with religious thoughts and feelings, as not inconsistent with a due observance of the Lord's day.

It is also worthy of consideration whether the transfer of the property to the donee under the will is not to be regarded as executed and perfected at the death of the testator, as in the case of a conveyance of land by deed. In the latter case it is expressly held that the title passes, although such deed was made and delivered on Sunday. *Sherman* v. *Sherman*, 3 Casey's (Penn.) 94, before cited, and a similar principle is announced in *Smith* v. *Bean*, 15 N. H. 577, where it was held that the court would not lend its aid to the vendor to recover possession of the vendee of a pair of oxen sold on Sunday, but would leave the parties where it found them, and at the same time would not aid the vendor to recover the price, if not already paid.

When it is said that a contract made on Sunday is void, it is not meant that it is void for all purposes, but the language is used in reference to the question whether there is any legal remedy to enforce it. If such contract is merely executory it is clear it cannot be enforced by a party who is in *pari delicto*. If, on the other hand, the contract be executed, the law will not interfere to disturb the possession or title of the parties under it. That this is the true view to be taken of the language that such a contract is *void*, is shown by the cases of *Smith* v. *Bean*, and of *Fennell* v. *Ridler*, 5 B. & C. 406.

The case of *Sherman* v. *Sherman*. 3 Casey 90, holding expressly that a conveyance by deed executed and delivered on Sunday is valid, lays down the general proposition that a contract not void at common law, nor expressly made void by statute, and which has been fully executed by the parties is valid, although it be made on Sunday, and although the act be prohibited by statute, but that the law will not lend its aid to enforce such a contract.

In *White* v. *Hunter*, 23 N. H. 129, a similar doctrine was recognized, and it was held that the court would not lend its aid to recover from the grantee the possession of land which was conveyed upon an unlawful and immoral consideration, and it is put upon the same ground as the payment of money upon such consideration. The same doctrine was held in respect to a conveyance of land to compound a felony, in *Worcester* v. *Eaton*, 11 Mass. 368.

It may perhaps be suggested in answer to this view, that wills do not stand in this respect like conveyances by deed, for the reason that the aid of the law is required in the probate of the will, and this is true; and yet in the case of the deed the due execution of it must be shown, or the grantee would be dispossessed. The difference after all is not in the substance of the thing but in the form and the mode of proof. It is the will itself, as in the case of the deed, that confers the title, and when proved it takes effect from the death of the testator. Upon this

point, however, we do not give an opinion, as we decide the cause upon another ground.

Again, in *Bloxsome* v. *Williams*, 3 B. & C. 232, it is held that a vendee of a horse sold on Sunday warranty, may recover of the vendor for a breach of that warranty, if the vendee did not know that the vendor was in the exercise of his ordinary calling when making such sale; upon the ground that the vendee was not *particeps criminis*, and therefore that the vendor could not set up his own illegal act by way of defence. A similar doctrine is suggested by Judge Bigelow, in *Bennett* v. *Brooks*, in the opinion furnished in advance of the report, though not expressed in the case as finally reported, neither was the point decided, although a strong intimation is given in favor of that doctrine.

In the case of a will, if the Sunday law has been violated at all, it is, or at least may be, by the maker alone, and the devisees and legatees can in no sense, unless participating in the act, be regarded as in *pari delicto*. At common law a will made on Sunday is valid, and the statute does not expressly make it void, and at most it only prohibits the act. If, then, the devisees and legatees have done no illegal act, it would be but a proper application of the principle of *Bloxsome* v. *Williams* to hold the will to be good as to them, and that it does not lie in the mouth of the heir to say that his ancestor had done an illegal act. If it be true that a person who is guilty of no illegal act himself, therefore is not in *pari delicto*, can enforce an executory promise made to him in violation of a statute on Sunday, as is clearly the doctrine of *Bloxsome* v. *Williams*, it must follow, of course, that a will made on that day must be valid to vest in the donees the property given to them.

It is a general rule in respect to acts and contracts not *malum in se*, but merely prohibited by positive statute without providing that such acts or contracts shall be void, that if the parties are in *pari delicto*, the law will not lend its aid to either, but leave them where it finds them; but where such acts or contracts are prohibited by statute to protect one set of men against another set of men, and for that reason or some other of like character, the parties are not *par delictum*, the law will lend its aid in favor of the innocent party, as in the case of usury, and certain bad practices upon bankrupts who have not obtained their certificates. *Browning* v. *Morris*, Cowp. 790; *Welsh* v. *Cutler*, 44 N. H. 561, and cases cited. See also *White* v. *Franklin Bank*, 22 Pick. 181. The principle upon which this class of cases rests must, we are inclined to think, apply in the case before us, and give validity to the will in favor of innocent devisees and legatees. It is unnecessary, however, to decide this question now, as we are satisfied that the making of a will on Sunday is not prohibited by the statute.

In reaching this result we have the satisfaction of feeling that we shall avoid disturbing the titles to some property held under wills of this kind, that might otherwise be affected. The number of such cases would not probably be large, but when it is remembered that any minor, insane person, married woman, or person out of the United States, or their legal representatives, are entitled to have the probate of any will proved without notice, re-examined at any time within one year after

the removal of the disability, we think there woul:d be reason to expect that some titles now considered as established migat be disturbed.

A suggestion is made that the will is void for uncertainty, but we can see no good ground for such a position, and in fact it is not much pressed by counsel. By the will the testator gives to his wife for her use, improvement and income, all his property of every name and kind he may die possessed of, to have and to hold the same to her own use and behalf forever, with the provision that she shall convey the farm on which he lived and the house and stock to her heir in the George line, by deed or will, to the latest time the laws of the State will permit; and with the provision that if both himself and wife die at the same time, or the wife within one year after his decease and before his estate was settled, then it is his wish that the farm, house, furniture and stock should go to his brother, John H. George, during his life, and after his decease to any male child of his who shall be named Paul George, or if he have none such then to testator's nearest of kin male child of that name.

The terms "all my property of every name and kind I may die possessed of" would include all his real and personal estate,—of that there can be no doubt; and it is equally clear that he gives it all to his wife except what is afterwards bequeathed. The gift to his wife is, we think, to take effect immediately upon the testator's death, and is not upon condition precedent. If, then, the subsequent provision that she shall convey the farm, house, and stock to her heir in the George line, by deed or will, becomes impossible by reason that there is no such person, then by well settled rules of construction the estate of the wife becomes absolute. 1 Jar. on Wills, 806, and cases cited; *Merrill* v. *Emery*, 10 Pick. 507. So if the condition be void because contrary to law or repugnant to the nature of the grant or devise, or afterwards becomes impossible by act of God, and without fault of the grantee or devisee, then the estate of such grantee or devisee becomes absolute. If, however, the condition is precedent, that is, to be performed before the estate vests, then the condition being void, the estate which depends upon it is void also; and nothing passes by the grant or devise. 2 Story's Eq. Jur. 1304, 5 & 6, and cases cited; 1 Jar. on Wills, 810.

If, then, the grant or devise be upon condition subsequent, that is, upon condition to be performed after the estate has vested, and the condition is void for uncertainty, then the estate of the grantee or devisee must be absolute.

In the case before us it is very clear that the estate was to vest before there was any conveyance to the wife's heir in the George line. It is obvious from the whole language of the gift that the estate was to vest immediately, and besides she was to convey either by deed which implies that the estate had already vested, or by will which could not take effect till her death, and so, too, whether there should be any such heir qualified to take was uncertain. Upon the whole, it is quite clear, we think, that the farm was to vest in her at once, and be held by her during life, unless she chose sooner to convey it by deed to her heir in the George line. If, then, no such heir should come into existence, then

the estate would vest in her absolutely, unless by her death within a year from the decease of the testator it vested in John H. George.

If, then, this provision be void for uncertainty, it follows from the principles suggested that the estate in the farm is absolute in the wife. We do not, however, see any good ground for so regarding this provision. The counsel for the heirs of the testator seems to have overlooked the fact that the conveyance is to be to *her* heir in the George line, and by that must be understood, we think, her child by the testator or its lineal descendant, for none other could be *her* heir in the George line within the meaning of that provision. There may be other provisions in the will which are open to doubt, but if there are, we see nothing that can affect the entire will. 1 Jar. on Wills, 316, 323, 327, and numerous cases cited.

These questions in regard to uncertainty do not, however, properly arise here, for if it may take effect in any part, although indefinite in others, it may properly be proved.

It is proper to observe that this cause has been argued by counsel upon both sides with unusual ability, and with a thoroughness of research that has afforded great assistance to the court in arriving at its conclusions upon several questions, about which the authorities are either conflicting or nearly silent.

Upon these views there must be a decree that the instrument in question is proved, approved and allowed as the last will and testament of the testator.